# IN THE COURT OF APPEALS OF IOWA

No. 21-1472
Filed February 16, 2022

**IN THE INTEREST OF K.D. and K.D.,**
**Minor Children,**

**PAUL L. WHITE, Guardian Ad Litem,**
        Appellant,

**C.H., Intervenor,**
        Appellant.

_____

Appeal from the Iowa District Court for Polk County, Lynn Poschner, District Associate Judge.

The guardian ad litem and intervenor appeal a decision not to remove the department of human services as guardian following termination of parental rights. **AFFIRMED.**

Paul L. White of Des Moines Juvenile Public Defender, Des Moines, attorney and guardian ad litem for minor children.

Andrea M. Flanagan of Flanagan Law Group, PLLC, Des Moines, for appellant intervenor.

Thomas J. Miller, Attorney General, and Natalie A. Deerr, Assistant Attorney General, for appellee State.

Considered by Vaitheswaran, P.J., and Tabor and May, JJ.

**TABOR, Judge.**

The juvenile court terminated the legal relationship between daughters, Ke.D. and Ki.D., and their parents. Then the children's guardian ad litem (GAL) and their grandmother Carletta urged the court to remove the Iowa Department of Human Services (DHS) as the children's legal guardian. The GAL and grandmother asked the court to appoint Carletta as the girls' guardian instead. Why? They asserted that (1) the DHS acted unreasonably in not providing notice to relatives, (2) the DHS violated its own policies by transferring Ke.D. and Ki.D. from Carletta's home to foster care, and (3) maintaining the DHS as guardian was not in the children's best interests. The juvenile court denied the motion to remove the DHS as guardian. That denial is at issue today. Like the juvenile court, we find the DHS took some unreasonable actions. Nonetheless, retaining that agency as the girls' legal guardian supports their long-term best interests.

## I. Facts and Prior Proceedings

Concerned about parental drug use, the DHS started children-in-need-of-assistance (CINA) cases for these children in 2018. At the time, Ke.D. was two and Ki.D. was three years old. Their mother, Kabra, and their father, Corey, exposed them to illegal substances and were not providing adequate supervision. That CINA case closed in late 2019 with Corey receiving custody through a bridge order. But in February 2020, the court removed the children from Corey, citing the parents' domestic violence and continued drug use. The court placed the children with paternal grandmother Carletta[1] under DHS supervision.

---

[1] Carletta is not a biological relative. But she is the spouse of the children's biological grandfather. And the girls view her as their grandmother.

The court terminated the parental rights of Kabra and Corey in April 2021. In the termination order, the court ordered guardianship and custody of the children be placed with the DHS. But they continued to live with Carletta. Our court affirmed termination following Kabra's appeal. *See In re K.D.*, No. 21-0581, 2021 WL 3897419 (Iowa Ct. App. Sept. 1, 2021).[2] In her appeal, Kabra did not challenge the court's order establishing guardianship and custody with the DHS after termination. *Id.* at *1.

Meanwhile, the children had been living with Carletta since the second removal. But after seventeen months, in July 2021, the DHS moved the girls from that placement with their grandmother to a foster home. The move took Carletta by surprise. DHS case manager Riley Hackman and adoption worker Amra Viso had scheduled a meeting with Carletta at her home without revealing their plan to move the children. Carletta thought that they would discuss her adoption of the children. Instead the DHS workers left with the children. Being so blindsided was "very upsetting" for both Carletta and the children. Ki.D. was so distressed she vomited. Ke.D. was shaking. Viso acknowledged that this sudden removal from their grandmother's home was "very traumatic" for the girls.

In quick reaction to that trauma, GAL Paul White moved to return Ki.D. and Ke.D. to their relative placement and to strip the DHS of its legal guardianship over the children. White informed the court that the DHS had failed to notify him of its intent to change the girls' placement after the termination. The GAL wrote:

> Despite the admitted strong bond between the children and their grandmother, the DHS took the children without court order to a foster home where they had no prior connection. The DHS has not stated any legitimate justification for [its] actions. After hearing on this issue, the undersigned requests that the DHS be removed as guardian.

---

[2] Corey did not appeal. *Id.* at *1 n.1.

In his brief to the court, White also argued that DHS was unreasonable in failing to provide written notice to the girls' relatives as required by Iowa Code section 232.84 (2021). Carletta moved to intervene in the case. The court allowed that intervention and set the GAL's motion for hearing.

After that hearing, the court found that the DHS acted irresponsibly by failing to send the relative notices required by statute. The court ordered the DHS to do so. But on the larger question of the children's best interests, the court rejected the GAL's arguments. The court credited the DHS for engaging in "a thorough process for considering a change of placement." That process included communication with the girls' therapists. The court declined to remove the DHS as legal guardian. And the court found it was not in the children's best interests to return to Carletta's custody. The court noted "deficits" in Carletta's ability to provide consistent care for the children—especially for their mental health. It criticized her dependence on family members who are unsafe around the children, her difficulty establishing boundaries, and her lack of a "working relationship with the children's therapists." On some points, the court found Carletta's testimony lacked credibility. White and Carletta both appeal the juvenile court's order.

## II. Scope of Review

We review de novo the court's post-termination decision. *In re E.G.*, 745 N.W.2d 741, 743 (Iowa Ct. App. 2007). "We review both the facts and the law and adjudicate rights anew." *Id.* "Although we give weight to the juvenile court's findings of fact, we are not bound by them." *Id.* We often defer to the juvenile court's credibility determinations because of its "unique opportunity to hear and observe the witnesses firsthand." *In re C.M.*, 526 N.W.2d 562, 565 (Iowa Ct. App. 1994).

### III. Discussion

In challenging the juvenile court's refusal to remove DHS as legal guardian, White and Carletta raise several overlapping points. We will address each point in turn. But first, some background.

After terminating parental rights, the juvenile court must transfer guardianship and custody of the children to one of the following: (a) the DHS, (b) "a child-placing agency," or (c) the other parent, a relative, or "other suitable person." Iowa Code § 232.117(3). The chosen guardian then must make periodic reports to the court about its efforts to establish a permanent home for the children. *Id.* § 232.117(6).

To remove the DHS as guardian, an "interested party" may apply to the court and request appointment of a new guardian. *Id.* § 232.118(1). Our code does not supply criteria for removing a guardian. *In re N.V.*, 877 N.W.2d 146, 150 (Iowa Ct. App. 2016). But our cases have examined the reasonableness of the DHS actions and the children's best interests. *Id.*; *E.G.*, 745 N.W.2d at 744. Even if the DHS acted unreasonably, we do not remove the agency as guardian unless it is in the children's best interests.[3] *Id.*; *In re I.P.*, No. 19-0715, 2019 WL 3317922, at *2 (Iowa Ct. App. July 24, 2019).

Unlike CINA proceedings, during post-termination proceedings, we observe no statutory preference for transferring guardianship of the children to any particular person or entity. *N.V.*, 877 N.W.2d at 150. Nor does the statute give the court the authority to

---

[3] When considering best interests in termination cases, we give primary consideration to the children's safety, to the best placement for furthering their long-term nurturing and growth, and to their physical, mental, and emotional condition and needs. *See* Iowa Code § 232.116(2). We look to that test for guidance in this post-termination decision.

direct a specific placement—that authority rests with the guardian. *In re E.G.*, 738 N.W.2d 653, 657 (Iowa Ct. App. 2007). The court's role is to monitor the placement. *Id.*

With that background, we turn to the parties' arguments

### A. Did the DHS act unreasonably as guardian?

White and Carletta allege the DHS acted unreasonably in carrying out its guardianship duties in at least two ways. First, by failing to send out relative notices. Second, by not considering the girls' strong bond with Carletta before taking them from her home and placing them with "strangers." On top of that, they argue the manner of that removal unnecessarily traumatized the children even further.

The juvenile court agreed that the DHS acted unreasonably by not sending the relative notices as required by statute. Section 232.84 requires the DHS, within thirty days of transferring custody of children from their parents, to "exercise due diligence in identifying and providing notice to the child's grandparents, aunts, uncles, adult siblings, parents of the child's siblings, and adult relatives suggested by the child's parents." During the CINA case, DHS worker Hackman did not send those notices. In her termination report, she said, "[R]elative worksheets are filled out only when children are sent to foster care. In this situation, they were placed with a relative/suitable other which did not require notices be sent out." She testified the girls' relatives were aware of their removal. After termination, she handed the case to DHS adoption worker Viso. Viso testified that Hackman told her there were no available family members to consider for adoption or permanent placement. So Viso did not investigate other possible relative placements.

We agree with the juvenile court that the DHS acted unreasonably when it did not exercise due diligence in identifying and notifying relatives about the girls' CINA case. Although Hackman and Viso testified the family was aware of the children's removal, the statute placed a duty on DHS to identify and notify the relatives regardless. "[F]ormal notice [is] required 'even if the relatives were informally aware of the child's transfer to foster care.'" *In re X.O.*, No. 16-0313, 2016 WL 2743445, at *3 (Iowa Ct. App. May 11, 2016) (quoting *N.V.*, 877 N.W.2d at 151). The juvenile court's order for the DHS to make belated notifications was an appropriate remedy for its statutory violation.

But White and Carletta assert the DHS also acted unreasonably in removing the children from Carletta, who had been caring for them for almost a year and a half. The GAL and grandmother believed that Carletta was a candidate to adopt the girls if their parents' rights were terminated. Carletta even began the Four Oaks evaluation process to adopt. But Hackman had a different understanding. She testified that growing concerns during the CINA proceedings convinced the DHS that Carletta could not provide an adoptive home post-termination.

Yet the DHS did not effectively communicate those concerns to Carletta. That lack of communication led to the jarring scene at Carletta's home in July 2021. Hackman and Viso admitted that they did not inform Carletta until they arrived that they planned to remove the girls. Why? They did not tell the grandmother of their plans in advance because they worried she would say inappropriate things to the children. We do not condone the manner of the removal. It was unnecessarily wrenching for the girls and was not justified to counterbalance the potential harm of what Carletta may have said to them. The DHS again acted unreasonably.

Still, we must decide whether—despite its unreasonable actions—the DHS was looking out for the children's best interests. *See E.G.*, 745 N.W.2d at 744. In a report to the court for a post-termination review hearing, the DHS worker listed several concerns about Carletta being a permanent placement for the girls. At the top of that list was the girls' mental-health treatment. They are both diagnosed with unspecified trauma and stress-related disorders. Both girls were seeing therapists who recommended that they be placed with a permanent caregiver who understands their emotional and developmental needs. In that vein, the therapists recommended that the caregiver be open to "a therapeutic parenting approach" and work closely with them. Both therapists wanted to see the children weekly.

Yet despite their pressing need for therapy, the children missed many appointments, according to the providers. Ki.D.'s therapist, Erin Helleso, was concerned that Ki.D. missed eleven of twenty-four scheduled sessions, all virtual.[4] Ke.D.'s therapists Deanna Rudolph and Megan Hasley reported that she attended sixteen of twenty-six sessions. To explain these attendance problems, Carletta testified she had moved farther away from the providers, injured her foot, and had to attend her own medical appointments. The juvenile court did not find that testimony credible because the sessions were mostly through telehealth. Carletta also reported technological problems with setting up the meetings but did not give details. As for her own interactions with the

---

[4] Helleso also had "concerns that [Ki.D.] is being coached things to say in therapy." For example, Ki.D. said she was not able to talk about her former foster parents because it "makes grandma mad." Helleso also reported Ki.D. said Carletta told her that the foster parents were "bad people." Carletta denied saying disparaging things about the foster parents.

girls' therapists, Carletta admitted she "didn't see eye to eye sometimes" with Helleso. And she never really talked to Ke.D.'s therapists.

A second DHS concern was that Carletta allowed another daughter-in-law, Heather, to live with her. Heather had pending child endangerment and drug charges, as well as a no-contact order with her own children. Carletta denied knowing about Heather's charges and no-contact order. But the DHS workers believed she was not being truthful on that score. The juvenile court also found that Carletta minimized the problems with having Heather in her home.

A final concern was that the children were not in daycare. And although she was six, Ki.D. was not enrolled to enter kindergarten in the fall. Carletta was uncomfortable sending them to daycare and school because of the COVID-19 pandemic but did not enroll Ki.D. in online classes either. We do not fault Carletta for making a judgment call that vexed many parents during the pandemic. Keeping a child at home rather than enrolling her in online kindergarten does not seem an unreasonable choice.

While there was a lack of communication between the DHS and Carletta about these concerns and their consequences, this record supplies cogent reasons why the DHS sought to move the girls to another placement. Hackman and Viso testified they consulted with the therapists about removing the girls from Carletta's care and acted on the therapists' recommendations. The workers considered the therapists' concerns that Carletta was not getting the children to much-needed therapy and exercised poor judgment about who could be around the children and what subjects could be discussed in front of them. What's more, Carletta's own testimony confirmed she did not have a good working relationship with the girls' therapists.

The DHS workers balanced the girls' long-term interest in getting treatment against their bond with Carletta. They reached the difficult, yet rational conclusion that Carletta could not continue as the permanent placement. In doing so, we believe they were acting in the children's best interests. Carletta's explanations about why the children were missing so much therapy did not satisfy the juvenile court, and we defer to its assessment.

In a separate argument, White contends the DHS decision to remove the girls from their grandmother and place them in "stranger" foster care violated the agency's own policies. He points to the preference for keeping children with relatives reflected in the federal funding bill known as the Family First Prevention Services Act,[5] as well as the state administrative code.

White's point is well taken. The Family First Act created new opportunities for states to receive federal funding for services that support and preserve family connections, while also keeping children safe. Indeed, placing these young girls with their grandmother aligns with the principles of Family First. Yet Family First principles do not dictate the post-termination decision here. Our current statute does not mandate a preference for relative placement after termination of parental rights. *N.V.*, 877 N.W.2d at 150 (referencing Iowa Code section 232.117(3)). And the worthy goal of keeping children with family must sometimes yield to the determination that another permanent placement would be in their best interests.

As for the state administrative code, it says relatives "shall be given consideration," but does not give relatives priority. Iowa Admin. Code r. 441-200.4(3)(b)(3). But White

---

[5] Bipartisan Budget Act of 2018, Pub. L. No. 115-123, §§ 50701–50782, 132 Stat. 232, 232-268 (Feb. 8, 2019).

is correct that removing children from family affects their wellbeing.[6] And although Viso hoped the girls' new foster family would adopt them, when the DHS removed them from Carletta that prospect was uncertain.

Still, we reach the same conclusion as the juvenile court—the DHS was acting in the children's best interests by placing priority on the children's mental health and educational needs when searching for a permanent placement. The record does not support the assertion by White and Carletta that by removing the girls from their grandmother's care, the DHS has cuts off their ties to extended family. In fact, Carletta has had visitation since their removal. In sum, the unreasonable actions by the DHS did not undermine its core mission of "looking out for [the children's] best interests." *See E.G.*, 745 N.W.2d at 744; *see also In re R.S.*, No. 15-1244, 2015 WL 5578273, at *2 (Iowa Ct. App. Sept. 23, 2015) (finding DHS action was "reasonable, responsible, and in the child's best interests" despite trauma caused by removal of child from foster family, with whom the child had bonded).

**B. Does retaining the DHS as guardian serve the girls' best interests?**

Despite concluding that the DHS acted unreasonably at times, we must consider the overall best interests of the children. At the time of the hearing, the children had been with the new foster family for about a month. The children's therapists reported their consistent attendance and noted that they could hold sessions in person, something that was impossible when the children lived with Carletta, who lived farther away and had her

---

[6] To the extent that White raises issues and facts arising after this hearing, we agree with the State that they may not enter our analysis. Similarly, we cannot consider the comments of therapists that occurred after the decision to remove the children because they do not weigh into the reasonableness of the decision when it was made. We do consider those factors in the overall best-interests analysis.

own mobility issues. Hasley reported Ke.D. was happy to be attending daycare, and she hoped it would promote more positive social-emotional development. Helleso reported Ki.D. felt secure and connected to her current living arrangement. She was enrolled in kindergarten and enjoying it. Viso testified the girls were "thriving." The record offers no information that a different placement would be better for their short- or long-term nurturing and growth. It may be true, as White and Carletta point out, that no other relative placements have been identified because the DHS did not send the notices during the CINA case. But the existing record shows no other permanent placement options. So it is in the girls' best interests for the DHS to remain as guardian and custodian.

### C. Does the record show a substantial change of circumstances?

Finally, Carletta contends the juvenile court did not identify a substantial change in circumstances after the termination order to justify removing the children from her care. Under prior law, a petitioner needed to show a substantial and material change in circumstances to modify an existing dispositional order. *See In re J.F.*, 386 N.W.2d 149, 152 (Iowa 1986). But superseding legislation and subsequent case law recognize that is no longer a requirement. *See In re E.R.*, 21-1345, 2021 WL 5919041, at *3 (Iowa Ct. App. Dec. 15, 2021) (holding that party seeking modification of permanency order need not show substantial change in circumstances). Plus, the order on appeal is not a dispositional order.

In sum, we conclude it is in the children's best interests for the DHS to continue as guardian and custodian rather than transfer guardianship to Carletta. We affirm the juvenile court order denying the motions.

**AFFIRMED.**

May, J., concurs; Vaitheswaran, P.J., dissents.

**VAITHESWARAN, Presiding Judge** (dissenting).

I respectfully dissent. The department of human services acted egregiously in entering the grandmother's home on the pretext of a visit and in snatching the children from the home. The department took these extrajudicial steps with knowledge that the children's guardian ad litem had contested the department's plan to move the children to foster care and with knowledge that the grandmother was preparing to adopt the children.

The children's trauma in the wake of the department's action was profound. The department employee overseeing the case conceded one of the children vomited during the removal. An adoption worker who was also present testified "[i]t was emotionally difficult for the children to separate from their grandma. . . . [T]he children were very upset." She reiterated, "They were absolutely sad and they didn't want to leave their grandmother" and "she's [a] lovely grandma, those children love her." The department's apparent obliviousness to the distress its actions caused stood in marked contrast to the grandmother's response. The adoption worker stated the grandmother "prioritized the children['s] well-being at that moment, and she was able to control her own feelings[,] . . .providing positive enforcement during that process."

Following the department's action, the children retained a deep attachment to their grandmother. The adoption worker stated the children were "always sad to leave Grandmother after the visit, they would like to spend more time with Grandma."

I recognize the children felt secure in their current placement. But one of the children's therapists noted that the child currently had an adverse childhood experience score of "9 out of a possible 10" and she cautioned that "[a]dditional placements and transitions are strongly discouraged to prevent further trauma." The adoption worker

testified she had not engaged in discussions with the current foster parents as to whether they wished to become adoptive parents, leaving no assurance that the foster home would become the children's permanent home.

In support of its action, the department cited the grandmother's failure to ensure the children's participation in therapy sessions. The grandmother admittedly fell short on this front for approximately three months. But it is worth noting that, in the two months between the department's seizure of the children and the hearing on whether the agency should be removed as guardian, the department facilitated a total of three sessions with one of the children's therapists, a far cry from the weekly sessions it expected the grandmother to assist with. As for the department's claim that the grandmother allowed inappropriate people around the children, the department employee conceded, "We have suspicions but no evidence."

I agree the key question is whether removal of the department as guardian was in the children's best interests. I believe it was.